## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

BURTON W. WIAND, as Receiver
over the assets of NICHOLAS SCOTT
CONGLETON,

     Plaintiff,                    Case No.:

v.

VIRAL STYLE L.L.C., BRANDON
CONGLETON, THOMAS BELL, and
DSCN, LLC,

     Defendants.

_____/

### **COMPLAINT**

Burton W. Wiand, as Receiver over the assets of Nicholas Scott Congleton (the "**Receiver**") appointed in the case styled *Federal Trade Commission v. NPB Advertising, Inc., et al.,* Case No.: 8:14-cv-1155-T-23-TGW (M.D. Fla.) (the "**FTC Action**"), by and through his undersigned counsel, hereby files suit against Viral Style L.L.C. ("**Viralstyle**"),[1] Brandon Congleton, Thomas Bell ("**Bell**"), and DSCN, LLC ("**DSCN**," and, collectively with Viralstyle, Brandon Congleton and Bell, the "**Defendants**"), and alleges as follows:

---

[1] The company refers to itself as "Viralstyle." *See* https://viralstyle.com/about-us (last visited November 19, 2021).

## INTRODUCTION

1.     On May 15, 2014, the Federal Trade Commission ("**FTC**") filed the FTC Action against NPB Advertising, Inc., a corporation, also d/b/a Pure Green Coffee ("**NPB**"); Nationwide Ventures, LLC ("**Nationwide Ventures**"); Olympus Advertising, Inc. ("**Olympus**"); JMD Advertising, Inc. ("**JMD**"); Signature Group, LLC (**Signature**"); Nicholas Scott Congleton ("**Nicholas Congleton**")[2]; Paul Daniel Pascual ("**Pascual**"); and Bryan Benjamin Walsh ("**Walsh**").[3]  FTC Doc. 1.[4]

2.     The FTC alleged that Nicholas Congleton and the other FTC Defendants engaged in a fraudulent marketing scheme related to a weight loss product known as "Pure Green Coffee."  *See* FTC Doc. 76 at 1-2.  "The FTC allege[d] that Congleton published or caused the publication of (1) false or unsubstantiated efficacy claims, (2) false establishment claims, (3) deceptive testimonials, and (4) deceptive news websites."  FTC Doc. 76 at 1.  Specifically,

---

[2] The FTC Action and related documents frequently refer to Nicholas Congleton as "Congleton." To avoid confusion between Nicholas Congleton's brother who is a party to this action, Brandon Congleton, the Congletons are referred to by their first and last names.

[3] An amended complaint (FTC Doc. 22) was filed on February 5, 2015, which added Sermo Group, LLC as a defendant, and Dylan Craig Loher ("**Loher**") and CPW Funding, LLC as relief defendants.  The defendants and relief defendants of the FTC Action are collectively referred to as the "**FTC Defendants**."

[4] The citation "FTC Doc." refers to the CM/ECF document number of a filing in the FTC Action, *Federal Trade Commission v. NPB Advertising, Inc., et al.*, Case No.: 8:14-cv-1155-T-23-TGW (M.D. Fla.).  The Receiver's citations to the court record of the FTC Action are to page number designations in the header of the court docket filings, except if the citation explicitly refers to the pagination of an original document.

the FTC alleged violations of Sections 5 and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.

3.     On December 12, 2015, the FTC filed their Motion For Summary Judgment Against Defendants Nicholas Scott Congleton And Dylan Craig Loher And Memorandum In Support (FTC Doc. 46).  The court in the FTC Action (the "**FTC Court**") issued an order (FTC Doc. 76) granting summary judgment in favor of the FTC which, among other things, required Nicholas Congleton to disgorge almost $30 million.  FTC Doc. 76 at 21.[5]

4.     In the FTC's motion for summary judgment, they explain that "[Nicholas] Congleton, the undisputed head of the operation and an owner and manager of five of the six corporate defendants, ran the revenue through a complex web of overlapping entities, diverting proceeds to luxury and personal expenses."  FTC Doc. 46 at 9.

5.     In granting the FTC's motion for summary judgment, the FTC Court observed the following:

> In April 2012, Nicholas Congleton received from a dietary-supplement manufacturer an e-mail touting the efficacy of "green-coffee extract" as a weight-loss aid.  The e-mail linked to a three-minute clip from the television show "Dr. Oz." In the clip, Dr. Oz describes a clinical study — the Vinson study — that "showed women and men who took green-coffee extract lost an astounding amount of fat and weight, 17 pounds in 22 weeks by doing absolutely nothing extra . . . ." After watching the Dr. Oz clip and searching the Internet to learn more about green-coffee extract,

---

[5] An amended judgment was issued against Nicholas Congleton in the amount of $30 million. FTC Doc. 80 at 1.

3

[Nicholas] Congleton, with co-defendants Paul Pascual and Bryan Walsh, founded a green-coffee extract business.  The trade name of the defendants' product is "Pure Green Coffee."

To operate the business, [Nicholas] Congleton, Pascual, and Walsh incorporated several corporations, including Nationwide Ventures, NPB, Olympus, JMD, Sermo, and Signature.  [Nicholas] Congleton, Pascual, and Walsh operated the Pure Green Coffee business primarily through Nationwide, but the corporations' functions overlapped.

Congleton bought several domain names, and in April or May of 2012 Pure Green Coffee began advertising on the Internet.  Congleton supervised the advertising campaign.  Collectively the corporations paid Google and other digital-advertising companies $9,403,769 for online advertisements, which generated $33,784,048 in gross receipts. [Nicholas] Congleton, Pascual, and Walsh deposited $30,220,088.26 into bank accounts belonging to the corporations.

FTC Doc. 76 at 1-2 (internal citations omitted).

6.    This judgment was the second of $30 million or more entered against Nicholas Congleton by a regulator stemming from allegations of deceptive or fraudulent practices, as the State of Florida obtained a judgment of more than $34 million in 2015 against Nicholas Congleton for his involvement in an allegedly fraudulent travel membership scheme.  *See* FTC Doc. 46 at 28.

7.    The same day as the FTC judgment, November 2, 2016, the FTC Court issued an order (FTC Doc. 77) granting a permanent injunction against Nicholas Congleton, and directing the clerk to enter a monetary judgment against Loher in the amount of $549,000.  *See* FTC Doc. 77 at 17.  Loher is Nicholas Congleton's half-brother.  *See* FTC Doc. 46 at 9.  This order also

required that a property owned by Loher be sold in partial satisfaction of the disgorgement judgment. *See id.* The Receiver was initially appointed to sell this property. *See* FTC Doc. 86; *see also* FTC Doc. 76 at 21-22.

8. Despite the judgment in the FTC Action and the resulting disgorgement obligation, Nicholas Congleton has not paid a dime. Subsequently, in part due to Nicholas Congleton's non-compliance with the FTC Court's order granting summary judgment and permanent injunction (FTC Docs. 76, 77), the FTC filed their Motion And Memorandum Of Law For An Order To Appear And Show Cause Why Defendant Congleton Should Not Be Held In Contempt For Violating Sections VIII And XVI Of The Court's November 2, 2016 Order And For Other Ancillary Equitable Relief (FTC Doc. 128) (the "**Receivership Motion**"). In support of that motion, the FTC submitted evidence demonstrating that Nicholas Congleton (1) continued to operate Viralstyle despite his claim that he was no longer involved in the business; (2) lied about his finances and failed to make crucial disclosures on sworn financial documents; (3) failed to disclose that his brother, Brandon Congleton, transferred nearly $80,000 to Congleton's wife in 2016; and (4) omitted and concealed his ownership of a 48-foot watercraft. *See, e.g.,* FTC Doc. 128 at 7-10. The FTC Court granted the motion in relevant part, substantially expanded the Receiver's duties, and froze Nicholas Congleton's

assets.  FTC Doc. 172 (the "**Receivership Order**").  The Receivership Order is the now the operative document governing the Receiver's activities.

9.   The Receivership Order directs the Receiver, in relevant part, to

[f]ind, marshal, and hold all Receivership Property for the purpose of paying to [FTC] the sum the Court ordered paid in November 2016 (see [FTC] Dkt. 77) including performing all acts necessary or advisable to preserving the value of those Assets, in order to prevent any irreparable loss, damage, or injury to consumers, including, but not limited to, obtaining an accounting of the Assets and preventing the transfer, withdrawal, or misapplication of Assets. . . .

FTC Doc. 172 at 11 ¶ E(1).

10.   Nicholas Congleton has not complied with the FTC Court's orders regarding his disgorgement obligations, or his obligations pursuant to the Receivership Order.  *See* FTC Doc. 172 at 18-20.  In fact, upon motion by the Receiver (FTC Doc. 251), the FTC Court has found Nicholas Congleton in contempt and issued a warrant for his arrest (FTC Doc. 261).  "Based on his unexcused non-compliance with lawful, valid, and explicit orders of the court, Congleton stands in CONTEMPT of the court's orders.  A warrant for Congleton's arrest will issue promptly, and the U.S. Marshal must locate and arrest Congleton and return him in custody to answer for his contempt."  FTC Doc. 261 at 2 (emphasis in original).

11.   The Receivership Order also authorizes the Receiver to "[i]nstitute, compromise, adjust, appear in, intervene in, or become party to such actions or proceedings in state, federal or foreign courts that the Receiver

deems necessary or advisable to preserve or recover the Receivership Property or to carry out the Receiver's mandate under this order."  FTC Doc 172 at 13 ¶ E(8).  The Receiver files this complaint pursuant to that express authority, the principles governing federal equity receiverships, and pertinent law, including the Florida Uniform Fraudulent Transfer Act, Florida Statutes § 726.101, *et seq.* (the "**FUFTA**").

## JURISDICTION AND VENUE

12.     The Court has subject matter jurisdiction over this matter pursuant to 7 U.S.C. § 13a-1, 28 U.S.C. § 754, and principles of ancillary or supplemental jurisdiction under 28 U.S.C. § 1367.  The Receiver brings this action to accomplish the objectives of the Appointment Order, and this matter is thus ancillary to the FTC Court's exclusive jurisdiction over the Receivership Estate.

13.     This Court has personal jurisdiction over the Defendants and their property.  Viralstyle, Brandon Congleton, and Bell are residents of the Middle District of Florida.  DSCN is, on information and belief, a Delaware limited liability corporation that transacts business and has assets in the Middle District of Florida.  This Court has personal jurisdiction over the Defendants pursuant to, without limitation, 28 U.S.C. §§ 754 and 1692, which provide jurisdiction over receivership property, including money and the individuals in

possession of that money, and which authorize nationwide service of process. The Receiver is in the process of complying with the statutory requirements.[6]

14.    Venue in this District and Division is proper under, without limitation, 28 U.S.C. § 754, as this proceeding is related to the FTC Action pending in this District, and the Receiver was appointed in this District.

## PARTIES AND RELATED INDIVIDUALS AND ENTITIES

15.    Burton W. Wiand is the duly appointed receiver over the assets of Nicholas Congleton.

16.    Viral Style L.L.C. doing business as Viralstyle is a Florida limited liability company and online T-shirt retailer founded by Nicholas Congleton and Brandon Congleton.   Viralstyle has its principal place of business in Tampa, Florida.

17.    Nicholas Congleton made transfers to Viralstyle.

18.    At one point Nicholas Congleton transferred all his shares of Viralstyle to Brandon Congleton, his brother.

19.    Brandon Congleton is a resident of the Middle District of Florida.

---

[6] The Receiver has filed a motion in the FTC Action for leave to continue prosecution of this action and for reappointment.  Reappointment would enable the Receiver to file the required papers in the U.S. District Court for the District of Delaware and thereby confirm his jurisdiction over DSCN pursuant to 28 U.S.C. §§ 754 and 1692.

20.    On information and belief, Brandon Congleton subsequently transferred some of the Viralstyle shares received from Nicholas Congleton to Bell and DSCN.

21.    Bell is a resident of the Middle District of Florida.  DSCN is, on information and belief, a Delaware limited liability corporation that transacts business and has assets in the Middle District of Florida.

22.    On information and belief, the Defendants Brandon Congleton, Bell, and DSCN are the current members, owners, partners, operators, and/or proprietors of Viralstyle.

23.    The Receiver, the FTC, and the Florida Attorney General are all creditors of Nicholas Congleton under the definitions of the FUFTA.

24.    Nicholas Congleton is a debtor as that term is defined by the FUFTA.

25.    Viralstyle and Brandon Congleton are transferees and Bell and DSCN are subsequent transferees under the FUFTA.

### FACTS COMMON TO ALL CAUSES OF ACTION

26.    Nicholas Congleton's Pure Green Coffee enterprise ("**PGC**") generated substantial revenue that he funneled through numerous corporations.

27.    As the FTC explained in the Receivership Motion:

> [Nicholas] Congleton sold Pure Green Coffee through a complex financial structure disproportionate to what was essentially a single-product business. Dkt. 46 at 24. At [Nicholas] Congleton's bidding, his deputies created numerous corporations, dead-drop addresses, and more than eighty bank accounts. *Id*. [Nicholas] Congleton kept his name off state incorporation filings and bank accounts, but held himself out as president and CEO of the business when communicating with vendors. *Id*. at 26. He typically directed others to make financial transactions, but also maintained electronic access to many of the business accounts. *Id*. at 27. This financial structure followed a model that [Nicholas] Congleton had established when he ran the travel club scam, for which he was sued by the state of Florida. In that case, the court determined [Nicholas] Congleton had created "an elaborate and overlapping corporate structure to . . . move the profit generated by the deceptive scheme, making any assets difficult to locate." *Id*. at 28-29.

FTC Doc. 128 at 3 (citations in original).

28. The individual defendants created corporations, dead-drop addresses, and bank accounts at an astounding rate. For example, hundreds of thousands of dollars of PGC proceeds were routed first through Consumer Consulting Group, Inc., to which Nicholas Congleton and Walsh had signatory authority, and then through Fantasy Media, Inc., an entity that, according to Walsh, Nicholas Congleton

> told me to start . . . so that we could do the advertising for Pure Green Coffee from a different company other than Pure Green Coffee . . . . for liability reasons." [PX12 at 7-8 (49:4-50:14)]. In all, PGC operated through ten different entities with overlapping officers and addresses [PX5 ¶¶ 3-15] and more than eighty bank accounts [PX6 at 10-12]. The dizzying structure created a bookkeeping nightmare and forced Walsh to spend much of his time transferring funds from one entity to another, often in the form of large cash withdrawals and deposits. [PX12 at 19-22, 36-37, 41-42 (133:14-18, 143:13- 145:15, 290:20-291:24, 322:18-323:5); PX14 at 21-24 (89:4-90:21, 92:6-93:2). See also PX6 ¶54].

FTC Doc. 46 at 24-25 (citations in original).

29.     Nicholas Congleton became aware of the FTC Action "[i]n March 2013 [when] Pascual received a civil investigative demand from the FTC and told [Nicholas] Congleton about the demand.  (Doc. 52-1 at 128–29)."  Doc. 76 at 3 (citations in original).

### a. Nicholas Congleton Creates Viralstyle

30.     During the time Nicholas Congleton was orchestrating the PGC scheme, he created Viralstyle.  An excerpt[7] of Viralstyle's original operating agreement is attached hereto as **Exhibit 1**.  Viralstyle was created to engage in the online custom T-shirt printing business and the company is still active today.  *See* www.viralstyle.com.

31.     When Viralstyle was created, Nicholas Congleton owned 85% of it and Brandon Congleton owned the remaining 15%.  *See* Ex. 1 at 1.  Nicholas Congleton transferred his shares in Viralstyle to Brandon Congleton on or about February 1, 2015.  *See* FTC Doc. 220-2 attached hereto as **Exhibit 2** (excerpt of a financial disclosure form Nicholas Congleton provided to the FTC.)[8]  Nicholas Congleton was not paid in exchange for his shares of

---

[7] In an abundance of caution, only excerpts of certain documents are attached to this complaint to avoid any potential conflict with any confidentiality designation or agreement between the Receiver, the Defendants named herein, the FTC, or the defendants in the FTC Action.

[8] Exhibit 2 only contains an excerpt of the form because the remainder of the form contains confidential information regarding Nicholas Congleton's finances.  *See* the preceding footnote.

Viralstyle; he transferred his shares to his brother Brandon as a "gift."  Ex. 2; *see also* FTC Doc. 220-3 at 7-8.

32.     Viralstyle was initially operated out of Nicholas Congleton's home. This is the same property described above that the Receiver was initially appointed to sell.  It consists of a "7,000-square foot building in Tampa that includes an apartment, a garage, and office/warehouse space."  FTC Doc. 46 at 29-30.  The funds used for the purchase and renovation of this property came from the PGC scheme.  *Id.*  Both Nicholas and Brandon Congleton worked for NPB Advertising and/or companies involved in the Pure Green Coffee scheme before Viralstyle was created.

33.     "Nationwide, NPB, Olympus, JMD, Signature, and Sermo used the same bookkeeper . . . and chief programmer, [Nicholas] Congleton's brother Brandon [PX22 ¶¶36, 120, 122-24]."  FTC Doc. 46 at 23 (citations in original). On January 31, 2013, at Nicholas Congleton's direction, Walsh (one of the insiders involved with the Pure Green Coffee scheme), withdrew $549,553.50 from an NPB bank account for the purchase the property that would become the first headquarters of Viralstyle.  FTC Doc. 46 at 29-30; *Id.* n.27.

34.     Nicholas Congleton initially used his personal PayPal account to accept customer payments and conduct other business activities.  *See* FTC Doc. 128 at 5.  On or about September 20, 2014, Nicholas Congleton purchased Viralstyle's first garment printer for approximately $10,000 using his personal

eBay and banking accounts. Nicholas Congleton secured Viralstyle's first customer, then-NBA player Iman Shumpert. *See* FTC Doc. 46-18 at 49.

35. In the summer of 2014, Nicholas and Brandon Congleton created Viralstyle's first bank accounts, at Chase. *See* FTC Doc. 46 at 30, n. 27; *see also* FTC Doc. 46-18 at 53: 3-5. Both Nicholas Congleton and Brandon Congleton had control over these accounts as managers of Viralstyle. FTC Doc. 121-5 at 16-18. At least one of these account opening documents included a portion of Viralstyle's operating agreement.

36. Nicholas Congleton commingled personal financial accounts with Viralstyle accounts because he had been "blacklisted" by various payment processing services due to his conduct during the fraudulent travel membership company prosecuted by the Florida Attorney General's Office.

37. Eventually, Viralstyle's Chase bank accounts were shut down, but not before Nicholas Congleton extracted hundreds of thousands of dollars from those accounts. *See* FTC Doc. 46-18 at 56. Nicholas Congleton claims to have done this because Chase was shutting down these accounts. *Id.*

38. Brandon Congleton has previously acknowledged that Viralstyle was primarily owned by Nicholas Congleton.

### b. Nicholas Congleton Allegedly Departs Viralstyle

39.     Nicholas Congleton allegedly departed Viralstyle in February 2015.  In exchange for his departure, Nicholas Congleton did not receive any compensation for his ownership interest in Viralstyle.

40.     Nicholas Congleton departed Viralstyle because of the heightened regulatory scrutiny and impending financial penalties that he was facing.  On March 18, 2015, the Florida Attorney General obtained a $34,830,728.46 judgment against Nicholas Congleton in connection with the timeshare scam. *See* Ex. 2; FTC Doc. 219 at 4 n.3.  The FTC obtained their judgment on November 4, 2016.  *See* FTC Doc. 80.

41.     At the end of the 2016 tax year, Brandon Congleton owned 35.2% of Viralstyle, Thomas Bell owned 13.18%, and DSCN, LLC owned 51.61%.  *See* FTC Doc. 219 at 5.

42.     The details of the transactions that lead up to this new ownership structure are unclear, because apparently, the means by which Nicholas Congleton transferred his 85% ownership interest in Viralstyle to Brandon Congleton were not memorialized in writing.

### c. Nicholas Congleton's Continued Involvement in Viralstyle

43.     In 2017, despite the fact that he had not paid either of the $30 million judgments that he owed State of Florida and the FTC, Nicholas

Congleton lived in a lavish home in Fort Lauderdale that rented for $6,700 per month. *See* FTC Doc. 128 at 15; FTC Doc. 172 at 2. Furthermore, Nicholas Congleton's then-wife Nevada Vanderford ("**Ms. Vanderford**") was receiving $9,000-$10,000 per month from Viralstyle.

44.     Prior to this time, Nicholas Congleton spent several months in the Bahamas. While in the Bahamas, the rent was again paid by Ms. Vanderford. In August of 2015 Ms. Vanderford was employed by Viralstyle.

45.     In October 2018, the Bahamian Police executed a search warrant on the home that Nicholas Congleton was renting. Inside the home, the authorities discovered several items of contraband including several credit cards in various person's names, blank "chip" cards, and a card printing machine. During subsequent police questioning, Nicholas Congleton acknowledged that the cards belonged to him and explained that they were related to his business – Viralstyle.

46.     The FTC subsequently deposed an acquaintance of Nicholas Congleton, Thomas Carbone ("**Carbone**"), who contradicted Nicholas Congleton's claims about departing Viralstyle. In addition to testifying that he had lived with Nicholas Congleton in the Bahamas for several months at Nicholas Congleton's request, Carbone testified that Nicholas Congleton had not "move[d] on from Viral Style" as he had claimed:

15

**FTC: So at the time, was Nick working for Viralstyle while you were in the Bahamas during this period?**

Mr. Carbone: Yeah.

**FTC: He was?**

Mr. Carbone: Yeah.

**FTC: Okay. And what was your understanding of Nick's role at Viralstyle during this period?**

Mr. Carbone: Running the entire business.

**FTC: Okay. And what is the basis for that understanding?**

Mr. Carbone: Everybody, as far as I know -- the way the business -- the direction of the business, the way the business went -- took -- I wouldn't normally call them "orders," but with Nick being there, I would say orders from Nick on exactly what to do, how to go about it, which direction to take, implementing new things into the business. Everything. Hiring, firing.

FTC Docs. 219 at 6; 220-4 at 3.

47.     After Nicholas Congleton allegedly departed Viralstyle, the company paid hundreds of thousands of dollars both directly to Nicholas Congleton and to third parties for his benefit – the latter apparently to conceal the true nature of the transactions.  This conduct appears to have begun no later than Nicholas Congleton's move to the Bahamas in 2015, even though he testified that he did not work for Viralstyle or receive any compensation from the company during that period.  For example, Carbone testified that he received "$8,000 to $12,000" from Viralstyle during the time he lived in the Bahamas with Nicholas Congleton that served as reimbursement for Nicholas Congleton's various expenses.  *See* FTC Doc. 220-4 at 3-4.  Carbone testified that this arrangement was created at Nicholas Congleton's direction:

> **FTC:  Okay. So you were aware that Nick was asking Viralstyle to send the money to your account to pay for these expenses?**
>
> Mr. Carbone:  Yeah.
>
> **FTC:  Okay. And he told you this?**
>
> Mr. Carbone:  Yeah.

*Id.* at 7.    Nicholas Congleton confided to Carbone that this was not for convenience but rather to thwart his creditors, including the FTC:

> **FTC:  Do you recall anything he said about his intentions in paying the FTC the money that he owes?**
>
> Mr. Carbone:  Yeah. I don't remember like specifically time and dates or exactly what was said, but he had definitely mentioned just not paying and taking care of it and him being smarter than lawyers and this and that, so…
>
> **FTC:  Okay.  So he's indicated that he doesn't intend to pay the FTC judgment?**
>
> Mr. Carbone:  Yeah.

*Id.* at 8.

48.    This pattern continued after Nicholas Congleton returned to the United States to purportedly resume working for Viralstyle.   During that period, Nicholas Congleton testified that Viralstyle made payments to Ms. Vanderford for his work in setting up a warehouse in Florida:

> **FTC:   And you said that you've been -- you were paid in several installments by Viralstyle for your work for them setting up the warehouse.  How did you receive those payments?**
>
> **Nick Congleton**:  PayPal.
>
> **FTC**:  Okay. What account did they –
>
> **Nick Congleton**:  Nevada [Vanderford]'s.

FTC Doc. 220-3 at 5-6.  Documents provided by Viralstyle in the FTC Action show that the company paid more than $150,000 to Ms. Vanderford's PayPal

account from June 2016 through June 2017 alone.  During her FTC deposition

on July 26, 2017, Ms. Vanderford testified this was done at Nicholas

Congleton's direction:

> **Vanderford:** It truly -- this is -- I know this is not going to make sense. Bonneville is my company, my company and my company only.  Okay?  There's PayPal deposits that are put into my -- into Bonneville, the business account, from Viralstyle.  That does not come to me.  That -- that is for Nick.  Nick had them put into Bonneville.  I never thought that was ever going to be a problem.

FTC Doc. 220-6 at 2.  These payments appear to be legitimate transfers to a

third party on Viralstyle's books and records, but in truth, they were intended

for Nicholas Congleton and structured to conceal the funds from potential

creditors.

49.     While married to Nicholas Congleton and after the FTC judgment,

Ms. Vanderford worked for Viralstyle and indicated that she earned an annual

income of more than $218,000.  According to Nicholas Congleton, Ms.

Vanderford earned this income by selling coffee mugs online through her

company called "Mug King" which sells custom coffee mugs using a "mug

press."  These activities were carried out at a Viralstyle warehouse that

Nicholas Congleton established sometime in 2016 after coordinating the

decision with Brandon Congleton.

50.     Nicholas Congleton acknowledged that he continued to work with

Viralstyle after he allegedly departed the company in 2015.  Nicholas

18

Congleton's duties included establishing new warehouses, buying and configuring the machines, and also ordering inventory for Viralstyle and setting prices for Viralstyle's products.  Nicholas Congleton also traveled for business for Viralstyle, and was reimbursed for his travel expenses.  This working relationship was purportedly governed by a verbal contract between Nicholas and Brandon Congleton and Nicholas Congleton was allegedly paid approximately $10,000 per month by Viralstyle through Ms. Vanderford's PayPal account, which Nicholas Congleton also had access to.

51.     While Nicholas Congleton was performing this myriad of duties for Viralstyle, he conducted at least some of it through a Viralstyle email address. In one particular instance, Nicholas Congleton was looking to hire a new creative director/designer for Viralstyle, and described Brandon as his "CTO/Partner."

52.     During the time that the PGC scheme was active (June 2012 through 2014), Brandon Congleton was paid hundreds of thousands of dollars per year for his role.  These salary payments were approved by Nicholas Congleton.  According to Brandon Congleton, his role at the PGC companies involved being the tech person, and setting up computers and office furniture.

53.     Brandon Congleton claimed that Nicholas Congleton owned Viralstyle.  Brandon Congleton characterized himself as a "project manager

over development and design" and claimed to not even know the Viralstyle
address in Tampa, or the names of the employees who worked at Viralstyle.

## COUNT I

### Florida Statutes § 726: Uniform Fraudulent Transfer Act

54.     The Receiver re-alleges each and every allegation contained in
Paragraphs 1 through 53.

55.     Because Nicholas Congleton intentionally and wrongfully caused
the transfer to Brandon Congleton, his brother, of his shares of Viralstyle as
identified in Exhibit 2, and because Nicholas Congleton intentionally and
wrongfully caused the transfer of assets including a garment printer to
Viralstyle, under the circumstances alleged in this complaint, the transfers
should be avoided as to Brandon Congleton and Viralstyle as well as all and
any subsequent transferees, including without limitation Bell and DSCN.  The
Receiver has a right to repayment of at least the amounts of the transfers from
the Defendants.

56.     Bell and DSCN are subsequent transferees because they received
from Brandon Congleton 13.18% and 51.61%, respectively, of the Viralstyle
shares.

57.     In light of this right to repayment, the FTC and the Receiver have
claims against Viralstyle, Brandon Congleton, Bell, and DSCN; and are
creditors of Viralstyle, Brandon Congleton, Bell, and DSCN under the FUFTA.

58.   The transfers that Nicholas Congleton made were inherently fraudulent because the transfers were made as part of the scheme described above.

59.   Those transfers were fraudulent under Florida Statutes § 726.105(1)(a) because Nicholas Congleton made the transfers with actual intent to hinder, delay, or defraud his creditors.

60.   Nicholas Congleton had actual intent to hinder, delay or defraud his creditors because, without limitation, prior to the transfers to Brandon Congleton and Viralstyle, Nicholas Congleton had been sued by the FTC in connection with his green-coffee extract business.   Nicholas Congleton's transfers occurred shortly before he incurred substantial debt, *i.e.*, judgments in favor of the Florida Attorney General and FTC against him.

61.   In making the transfers, Nicholas Congleton absconded, and removed or concealed assets.   The transfer of shares was to his brother, an insider, and Nicholas Congleton retained control of the property transferred after the transfer, by continuing to operate and receive funds from Viralstyle.

62.   Those transfers also were fraudulent under Florida Statutes § 726.105(1)(b) because Nicholas Congleton made the transfers ostensibly as a gift, and did not receive a reasonably equivalent value in exchange; and because he was engaged or was about to engage in a business or transaction for which his remaining assets were unreasonably small in relation to the

business or transaction; and he intended that he would incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

63.     Those transfers also were fraudulent under Florida Statutes § 726.106(1) because Nicholas Congleton did not receive a reasonably equivalent value in exchange for the transfers, and he was insolvent at all relevant times.

64.     Those transfers also were fraudulent under Florida Statutes § 726.106(2) because the transfers were made as gifts, Nicholas Congleton was insolvent at the time, and Brandon Congleton and Viralstyle had reasonable cause to believe Nicholas Congleton was insolvent.

65.     On behalf of the Receivership Estate, the Receiver is entitled to avoid and recover from the Defendants value equal to, at minimum, the value of the shares that Nicholas Congleton transferred to Brandon Congleton, plus the value of Nicholas Congleton's transfers to Viralstyle (and to any other pertinent remedy, including those available under Florida Statutes § 726.108).

66.     The equities require an adjustment to the value of the transferred assets pursuant to Florida Statutes § 726.109(3).

67.     Because no Defendant can satisfy the statutory good faith affirmative defense to claims under Florida Statutes § 726.105(1)(a) as stated in § 726.109(1), the Receiver is entitled to recover the transfers to Brandon

22

Congleton and Viralstyle from them and from subsequent transferees Bell and DSCN.

WHEREFORE, the Receiver asks this Court to enter judgment against Viralstyle, Brandon Congleton, Bell, and DSCN, avoiding transfers to them, together with interest and costs, the imposition of a constructive trust, and for such other and further relief as required by law and as the Court may deem just and proper.

## COUNT II
### Unjust Enrichment

68. The Receiver re-alleges each and every allegation contained in Paragraphs 1 through 53.

69. This unjust enrichment claim is asserted in the alternative, in the event the statutory remedy asserted in Count I does not provide an adequate remedy at law.

70. Viralstyle, Brandon Congleton, Bell, and DSCN received a benefit when in furtherance and during the course of the scheme described above, Nicholas Congleton wrongfully caused the transfer to Brandon Congleton, his brother, and subsequent transferees Bell and DSCN, of his shares of Viralstyle as identified in Exhibit 2, and moreover Nicholas Congleton wrongfully caused the transfer of assets to Viralstyle, in an amount equal to the value of those

shares and those assets plus any other transfers received by Nicholas Congleton from Viralstyle.

71.    Viralstyle, Brandon Congleton, Bell, and DSCN, knowingly and voluntarily accepted and retained a benefit in the form of those transfers.

72.    The circumstances alleged in this complaint render Viralstyle, Brandon Congleton, Bell, and DSCN's retention of that benefit inequitable and unjust so they must pay the Receiver, acting on behalf of the Receivership Estate, the value of the benefit received.

73.    Viralstyle, Brandon Congleton, Bell, and DSCN have been unjustly enriched at the expense of the Receivership Estate in the amount of the transfers received by Viralstyle, Brandon Congleton, Bell, and DSCN, and the Receivership Estate, through the Receiver, is entitled to judgment in that amount.

74.    The equities require that the Receiver recover value for the assets in excess of their worth at the time of transfer.

75.    The Receiver, on behalf of the Receivership Estate, is entitled to the return of that money through disgorgement or any other applicable remedy.

WHEREFORE, the Receiver asks this Court to enter judgment against Viralstyle, Brandon Congleton, Bell, and DSCN for the value of the transfers received by them, as well as any other amounts of money or other assets

received by them from the Receivership Estate, together with interest and costs, the imposition of a constructive trust, and for such other and further relief as the Court may deem just and proper.

## COUNT III
### Money Had and Received

76.    The Receiver re-alleges each and every allegation contained in Paragraphs 1 through 53.

77.    This money had and received claim is asserted in the alternative, in the event the statutory remedy asserted in Count I does not provide an adequate remedy at law.

78.    Viralstyle, Brandon Congleton, Bell, and DSCN received a benefit when in furtherance and during the course of the scheme, Nicholas Congleton wrongfully caused the transfer to Brandon Congleton, his brother, and subsequent transferees Bell and DSCN of his shares of Viralstyle as identified in Exhibit 2, and when Nicholas Congleton moreover wrongfully caused the transfer of assets to Viralstyle, in an amount equal to the value of those shares and those assets and any other transfers received by Nicholas Congleton from Viralstyle.

79.    For those reasons, Viralstyle, Brandon Congleton, Bell, and DSCN knowingly and voluntarily accepted and retained a benefit.

80.     The circumstances alleged in this complaint render retention by Viralstyle, Brandon Congleton, Bell and DSCN of that benefit inequitable and unjust so that in good conscience they must pay the Receiver, acting on behalf of the Receivership Estate, the value of the benefit received.

81.     Viralstyle, Brandon Congleton, Bell, and DSCN have money in their hands belonging to another, and in equity and good conscience, they ought to pay over that money to be made available to that other.

82.     Viralstyle, Brandon Congleton, Bell, and DSCN have been unjustly enriched at the expense of the Receivership Estate in the amount of the transfers made by Nicholas Congleton plus the value of all funds received by Nicholas Congleton from Viralstyle, such that the Receiver is entitled to judgment in that amount.

83.     The equities require that the Receiver recover value for the assets in excess of their worth at the time of transfer.

84.     The Receiver, on behalf of the Receivership Estate, is entitled to the return of that money through disgorgement or any other applicable remedy.

WHEREFORE, the Receiver asks this Court to enter judgment against Viralstyle, Brandon Congleton, Bell, and DSCN to the extent of the value of all transfers by Nicholas Congleton plus the value of all funds received by Nicholas Congleton from Viralstyle, as well as any other amounts of money or

other assets received by them from the Receivership Estate, together with interest and costs, the imposition of a constructive trust, and for such other and further relief as the Court may deem just and proper.

/s/ **Matthew J. Mueller**
Matthew J. Mueller, FBN 047366
FOGARTY MUELLER HARRIS, PLLC
100 E. Madison, Suite 202
Tampa, Florida 33602
Tel:   813-347-5100
Fax:  813-347-5198
Email: matt@fmhlegal.com
LEAD COUNSEL

/s/ **Lawrence J. Dougherty**
Lawrence J. Dougherty, FBN 68637
ldougherty@guerraking.com
Robert Max McKinley, FBN 119556
mmckinley@guerraking.com
GUERRA KING P.A.
The Towers at Westshore
1408 N. West Shore Blvd., Suite 1010
Tampa, FL 33607
Tel.:  (813) 347-5100
Fax:  (813) 347-5198

*Attorneys for Burton W. Wiand,*
*the Court-appointed Receiver over the*
*assets of Nicholas Congleton*